174 So.2d 479 (1965)
Arnold Clifford NEWMAN, Petitioner,
v.
STATE of Florida, Respondent.
No. 4513.
District Court of Appeal of Florida. Second District.
April 21, 1965.
*480 Charles E. Davis, of Fishback, Davis, Dominick & Troutman, Orlando, for petitioner.
Earl Faircloth, Atty. Gen., Tallahassee, and Robert R. Crittenden, Asst. Atty. Gen., Lakeland, for respondent.
KANNER, Judge,
The skull of a Seminole Indian, John Osceola, about two years deceased at the time, was taken from a box or coffin situated on the ground in a sawgrass island of Big Cypress Swamp in the Florida Everglades, Collier County, by defendant-petitioner, Arnold Clifford Newman, a fourth year student at the University of Miami. He was charged by the State with wantonly and maliciously disturbing the contents of a tomb or grave. Jury trial was waived; Newman was tried before the county judge, found guilty, and was sentenced to six months imprisonment in the county jail. Appeal was taken to the circuit court which, without opinion, affirmed the judgment and sentence.
Newman seeks through petition for writ of certiorari to quash the circuit court's judgment of affirmance, urging in effect that the State failed to establish that he had committed the criminal offense as denounced by the statute[1] under which he was tried and convicted and that, because of this, there was a departure from the essential requirements of law. Primarily, the State's position is that petitioner presents nothing warranting the issuance of writ of certiorari because there was no flagrant departure from the essential requirements of law and that this petition, *481 rather, is an attempt to gain a second appeal.
Under the circumstances reflected by the record, petitioner is entitled to have his case reviewed. As announced in Haile v. Bullock, 1922, 83 Fla. 538, 91 So. 683 at page 684, questions of the weight and probative force of conflicting testimony ordinarily may not be considered; and mere errors of procedure that do not obviously prejudice fundamental rights, to the material injury of complaining parties, may not cause a judgment to be quashed on certiorari; but serious irregularities or material fundamental errors in applying the law, or the entire absence of essential evidence with resulting material injury may be ground for quashing a judgment on certiorari. Thus, as to the facts in review on certiorari, the rule articulated in State Beverage Department v. Willis, Fla. 1947, 159 Fla. 698, 32 So.2d 580, 583, is that "on certiorari the court will not ordinarily review conflicting testimony, but only such absence of evidence as results in injury sufficient to amount to a departure from the essential requirements of law." As more recently phrased by the supreme court in Cohen v. State, Fla. 1957, 99 So.2d 563, 565, "A judgment that has no competent substantial evidence to support it cannot and should not stand; and an affirmance of that judgment is such a departure from the essential requirements of law as to require this court, in the exercise of its ancient power to issue the common-law writ of certiorari, to quash the order of affirmance."
In taking cognizance of the petition for the writ under the above pronouncements, we have examined the record and find that there is no competent substantial evidence to support the judgment of conviction.
The State produced as witnesses two Seminole Indians and a deputy sheriff, calling to testify for it additionally a young lady who had come with petitioner as his witness. The import of the testimony of all three witnesses other than the one last mentioned was mainly to identify the burial place of John Osceola, to describe the scene, and to explain the burial customs of the tribe or clan.
The witness, William McKinley Osccola II, in his identification testimony, stated that he was present at the burial of John Osceola. He explained that the Indians never asked permission from any official or from the county, that they bury their dead any place they want to, chosen by the Indians themselves. He did not know who owned the land. He stated that the kin of the dead cannot go back except four moons, or two months, after a body is buried; in all his life he never saw an Indian go back to a grave. After the fourth moon they forget about the body altogether, unless there is some reason to go back. To mark the grave, four sticks are placed across a box and after that everything just rots down to the ground, that's all. The burial place, he said, is kept secret. The other Indian witness, Ruby Osceola, gave further identification testimony.
The deputy sheriff's testimony indicated that he went to the scene the day before the arrest and took pictures. He had never been there before; he could not say whether this was John Osceola or someone else; and of his own knowledge he did not know who took the skull. As an officer dealing with the Indians, he knew this was an Indian burial ground. The land was not part of an Indian reservation, and he did not know who owned it nor whether the Indians had any permission to use that particular land. The witness stated that the box or casket containing the remains was in the thick of a long sawgrass and cypress swamp on high ground; there was no fence, no signs or anything of that type; it was just a swamp. Pictures taken by him and introduced into evidence, by the officer's description in response to questioning, showed a casket, a decomposed body with the head missing, numerous boards lying around, and the lower jaw of a head lying beside the coffin. From his knowledge of the Indians, the usual custom is to *482 put their dead with their personal belongings on the ground open to the elements.
The only eye witness was a young lady above mentioned, who at the time was and had been for three years a student at the University of Miami, a psychology major. She accompanied petitioner into the Everglades and saw him take the skull. The two of them went to the site to take pictures; she herself took a few pictures. As she described the place at various points in her testimony, there was no fence nor anything to show that this was a burial ground; they walked through the sawgrass and there ahead were trees and that's where it was. The top of the box was off and it was just sitting there; she saw it was mutilated, with clothes torn up. After taking the photographs, petitioner took the skull; it was already detached, and he did no poking around and didn't break anything open to get at it; it was just a question of seeing it there, and you just don't know what to make of it. Petitioner made no attempt to hide the skull but told everybody about it and took it in broad daylight. She characterized petitioner as one interested in things naturalistic, a very serious minded student who liked to go hunting and who collected animal and alligator skulls.
At the conclusion of the State's case, as above summarized, petitioner moved for a verdict of acquittal, which the court denied.
Among the defense witnesses, several college students, acquaintances of petitioner, testified essentially that, unaccompanied by petitioner, they had made a trip into the Everglades prior to the incident in question and had come upon the coffin. Aside from the Indians themselves, these were the first witnesses to have seen it. The gist of their testimony was that the skull was then lying on the ground a few feet away from the coffin, which was already open. Wishing to take pictures one of the boys picked up the skull and positioned it in the coffin. All described petitioner as a serious minded boy with an interest in zoology and things of nature.
Petitioner, by his testimony, indicated that he had seen the pictures taken by the other boys and knew the location. He had just purchased a polaroid camera, and he, along with the young lady mentioned, had gone into the Everglades swamp for the purpose of taking pictures also. He found two alligator skulls which he took back. As to the spot in question, there was nothing visible as an indication that it was a burial ground, but there was just an open box that was disintegrated by weather and time. He thought it was abandoned out there in the Everglades; it was so isolated; all he knew of Indian graves was the Indian mounds he had seen on trips into the Everglades. He had taken zoology and other science electives and had done some work for the zoology department at the university, a field which he had been pursuing outside of school; he had been employed the preceding summer at the Miami serpentarium. He stated that there was no intent to do anybody wrong or an injustice or commit a moral wrong; if he could make amends, he would appreciate the opportunity to do so. On cross-examination, the State inquired if he wished at that time to make an apology to the Seminole Indian Nation or if that were what he stated on direct examination; petitioner replied, "That is absolutely correct."
Two University of Miami assistant professors who were also assistant deans gave character testimony for petitioner, representing the university through sanction or suggestion of their dean. The testimony of the first disclosed that petitioner was a fourth year student and was to graduate in August of that year, that he had a definitely clean record of moral and general deportment, that he had taken the basic courses in zoology and geology, that he had earned four B's and an A during the past semester, that he liked to tramp through the woods and go snake hunting, and that he was a serious minded boy. That assistant dean explained, upon questioning, that he wouldn't be there representing the University of Miami officially if there were any *483 blotch on petitioner's character and stated that he wished the students were all like petitioner. The case had been assigned for investigation by the university to the second of these professors, assistant to the dean of men; a thorough investigation was conducted, with results satisfactory to the university.
At the close of all the evidence, petitioner renewed his motion for a directed verdict; it was again denied.
The offense charged may be considered broadly as falling within the classification of malicious mischief. Statutes are found in many states defining malicious mischief, prescribing its punishment, and sometimes expressly enumerating what acts must be proved to constitute it. 3 Underhill's Criminal Evidence, 5th edition, chapter 45, Malicious Mischief, section 620, pages 1486, 1487. Generally, malice has been held to be an essential ingredient of the offense of malicious mischief, although in some states the statutes are worded so as not to require the injury to be committed maliciously. In that case, it has been held that the crime is in the nature of a trespass. Chapter 24, Malicious Mischief, section 657, page 455 of 2 Wharton's Criminal Law and Procedure by Ronald A. Anderson, based on Wharton's Criminal Law, 12th edition and Wharton's Criminal Procedure, 10th edition.
It is significant that, in the statute under which the present charge is laid, the word "willfully" is the ingredient which attaches to the doing of the specified acts of destruction, mutilation, and the like as these apply to the things denoted throughout the body of the statute, on down to that point where disturbing the contents of a tomb or grave is condemned; there, the single qualifying adverb is changed, and the words, "wantonly and maliciously," are chosen. Hence, the gravamen of the offense is the proscription against a wrongful act which has been wantonly and maliciously perpetrated. The language of the statute connotes a particular intent which fastens to and is a part of the crime prescribed. If an act is criminal only when done with a particular intent, the presence of the designated intent must be proved. The rule as to proof of malicious intent has been thus stated, "Usually, proof of the injury alone is not enough, and this is always the case where a statute requires that it shall be proved to have been wantonly or maliciously inflicted." 2 Underhill's Criminal Evidence, supra, sections 624 and 621, pages 1493 and 1487. The important and essential element here, therefore, is that the wrongful act must have been done wantonly and maliciously in order to establish the crime by reason of the statutory prescription. So more is required than the mere doing of the deed.
Statutes penal in character must be strictly construed. State ex rel. Cooper v. Coleman, 1939, 138 Fla. 520, 189 So. 691. An accused must be plainly and unmistakably within the criminal statute to justify a conviction. Watson v. Stone, 1941, 148 Fla. 516, 4 So.2d 700.
We have here an unusual situation which concerns unfamiliar and secret tribal burial customs involving as the setting a scene of disarray in a wild sawgrass and cypress swamp. Aside from the testimony of petitioner himself and his companion at the time, the only witnesses to the act complained of, the evidence yields nothing which could even connect petitioner with that act. The responses of these two were in accord and the narrative which emerged through their testimony consistent. This evidence shows that there was no attempt at the trial to deny the taking of the skull and no attempt to conceal the act at any time. The object of the trip into the Everglades expressly was that of taking pictures as the other boys had previously done. Both petitioner and his companion did take pictures.
We have found no Florida case that has been decided as to the statutory *484 offense charged, and we have found no case in any jurisdiction involving circumstances like those here presented. The sanctity of the final resting place of the Indian peoples or any other peoples should be recognized and should be accorded highest respect. However, as we have indicated, in order to constitute the offense under the statute, the wrongful act must have been done wantonly and maliciously; or, otherwise stated, the petitioner must be plainly and unmistakably within the statute in order to justify a conviction. We must conclude that, under the proof required by the statute, there is no competent substantial evidence to support the judgment of conviction. For that reason, the judgment of affirmance is a departure from the essential requirements of law and is accordingly hereby quashed.
It is so ordered.
WHITE, Acting C.J., and DOWNEY, JAMES C., Associate Judge, concur.
NOTES
[1] "872.02 Disfiguring tomb

"Whoever willfully destroys, mutilates, defaces, injures or removes any tomb, monument, gravestone or other structure or thing placed or designed for a memorial of the dead, or any fence, railing, curb or other thing intended for the protection or ornamentation of any tomb, monument, gravestone or other structure before mentioned, or for any enclosure for the burial of the dead, or willfully destroys, mutilates, removes, cuts, breaks or injures any tree, shrub or plant placed or being within any such enclosure, or wantonly and maliciously disturbs the contents of a tomb or grave, shall be punished by imprisonment not exceeding one year, or by fine not exceeding five hundred dollars."